## Case No. 5,329.

### The GEORGE.

### [1 Sumn. 151.][1]

Circuit Court, D. Massachusetts. May Term, 1832.[2]

SEAMEN'S WAGES —RIGHTS OF MATE UPON DEATH OF MASTER—RIGHT TO BE CURED.

1. A mate, succeeding to the command of the ship upon the death of the master, does not thereby lose his character as mate; but may sue in the admiralty for his wages.

[Cited in ·The Leonidas, Case No. 8,262; Packard v. The Louisa, Id. 10,652; The Merchant, Id. 9.434.]

[Cited in Hutchins v. Ford, 82 Me. 376; Tate v. Protection Ins. Co., 20 Conn. 483.]

. 2. .He is also entitled to be cured at the expense of the ship, in the same manner, as a seaman. And, therefore, if he is put on shore from sickness for the convenience of the ship, his expenses for medicines, advice, attendance. and board, are to be borne. by the ship-owner.

[Applied in The Forest, Case No. 4,936. Cited in Richardson v. The Jnillette. Id. 11,784; The ·Leonidas, Id. 8,262; Ringgold v. Crocker, Id. 11,843; The Atlantic, Id. 620; Babcock v. Terry, Id. 702; The Ben Flint, Id. 1.299; Callon v. Williams, Id. 2,324; The North America, Id. 10,314; Brown v. The D. S. Cage, Id. 2,002; The

---

1 [Reported by Charles Sumner, Esq.]
2 [Affirming Case No. 8,035.]

Edward Albro, Id. 4,290; The A. Heaton, 43 Fed. 596.]

[Cited in Duncan v. Reed. 39 Me. 417; Croucher v. Oakman, 3 Allen, 189; Holt v. Cummings, 102 Pa. St. 215.]

3. It seems that the like rule applies to a master.

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a libel for mariner's wages in the admiralty, originally against the vessel, and now proceeding against the owners [Joseph Wescott and others]. Upon the hearing of the cause in the ·district court [Case No. 8,035], it was decreed, that the libellant [William Lamson] was entitled to wages to the amount of fifty-four dollars and fifty cents and costs of suit. From this decree the owners entered an appeal to the circuit court.

Mr. Curtis, for appellants.

Mr. Nichols, for appellee.

STORY, Circuit Justice. This is a libel instituted by the libellant in the admiralty for wages due to him, as mate of the brig George, for a voyage from Boston to St. Jago, in the island of Cuba, and back to the United States. There is no dispute as to the claim for wages, the amount being admitted. But the owners bring forward a claim in the nature of a set-off for money expended for the libellant on account of his sickness on shore at St. Jago. The items of the account are for board, washing, apothecary's bill, physician's bill, and wine supplied for the libellant, amounting in the whole to $74.75. It is not denied, that the expenses have been incurred, and paid by the owners; and the sole question is, whether they are to be borne by the owners of the brig George, or by the libellant, there having been a suitable medicine chest and medical directions on board for the voyage, according to the requisitions of the act of congress. The facts are, that the master of the brig died at St. Jago, of the yellow fever, and the mate upon his death, with the consent and approbation of the consignee and the American consul, assumed the command of the vessel. The mate was at this time ill with symptoms of the same disease; and, the vessel being at that time about to proceed to another port in Cuba to take in a part of her cargo, it was deemed the most prudent step for the mate to go on shore, both for his own relief and the safety of the crew; and that the vessel should proceed to the other port under the command of the pilot. She accordingly did so proceed, and returned again to St. Jago after an absence of fourteen days. The libellant was then on the recovery, and resumed his station on board. But subsequently, when the vessel was about to depart for the United States, it was deemed most advisable by the libellant, and the consignees, that another person should be appointed master; and he was accordingly appointed, and the libellant returned to the United States in the brig, performing only the duties and functions of mate. It is not now controverted, that the conduct of the libellant in going on shore during his illness was wise and prudent, and for the interest of all concerned; nor that the subsequent appointment of another person, as master for the voyage, was not equally advisable under all the circumstances. The point of defence, or rather of set-off, rests on another ground; and that is, that as the mate was, at the time the expenses were incurred, acting as master of the vessel, he is not entitled to be cured at the expense of the ship, but at his own personal expense.

In the case of Harden v. Gordon [Case No. 6,047], the question of the liability of the owners to pay the expenses of curing seamen, who are taken sick in the course of the voyage, was largely discussed. It was there held, that, by the general maritime law. the expenses of sick seamen are to be borne by the ship; and that in these expenses are to be included, not only medicines and medical advice, but nursing, diet, and lodging, where these are necessarily incurred; that the act of congress—Act 1790, c. 29, § 8 [1 Stat. 134] —had not changed the maritime law, except so far as respects medicines and medical advice, where there is a proper medicine chest and medical directions on board; and that the act of congress was inapplicable to cases, where the seamen are sent on shore for the safety or convenience of the ship, and in all such cases the maritime law remained in full force. There was some peculiarity in the circumstances of the case of Harden v. Gordon [supra], which did not call for so exact and determinate an expression of the opinion of the court, as is now announced; but the whole reasoning of the court leads to this conclusion, and, indeed, cannot otherwise be maintained. I do not, therefore, go over the general doctrine, being ·quite content to leave it upon the arguments' then adduced in its support. But I feel bound to say, that I have never, since that time, had the least inclination to withdraw from any part of that opinion. But if I had, it would rather be to enlarge, than limit the construction favorable to the seamen. I then had, and continue to have, great doubt, whether the act of congress ought to have been allowed to have any operation as an exception out of the maritime law; and whether the provision for a proper medicine chest was not merely directory, and the omission made penal upon the master personally, without the slightest· intention on the part of congress to interfere with the general duties and responsibilities of the owners, created by the maritime law. Be this as it may, the present case does not call for any review of that point.

In the present case, if the mate had remained in his station as mate. and the master had been living, and with a view to his own accommodation, and the convenience of

the ship, and the safety of the crew, he had been removed on shore with the consent of the master, I should not feel the slightest difficulty in saying, that all the expenses in question must be borne by the ship. The attendance, and watching, and nursing, and preparation of suitable food, for sick seamen on board, independent of all other considerations, is a very serious interruption of the common ship's duty and business, and often imposes hardships upon other seamen, which may endanger their ability to attend fully to other duties, and often may prove injurious to their present health. And if a speedy recovery of the sick seamen, and the preservation of human life be an object, (as it ought ever to be,) to insure a prompt return to duty, and a speedy performance of the voyage, it is a matter of the highest prudence in a considerate master to take every measure calculated to produce these results. The attendance and medical advice and nursing, which can be obtained on shore, are far more regular, intelligent and beneficial, than any, which can be obtained on board of the ship amidst the hurried duties of a seafaring life. And the hiring of new seamen in foreign ports to supply the place of those, who are ill, or die, is often a most inordinate and oppressive charge upon the owners. Public policy, as well as the ordinary claims of humanity, demands, that the interests of the seamen should be in these respects linked to those of the ship; and, thus, new means are furnished to enforce Christian duties and Christian responsibilities. I confess, that with these views, I should have the utmost reluctance to do away one jot or tittle of the provisions of the maritime law, acting so wisely and beneficially on this subject. See Pard. Droit Comm. tom. 3, p. 3, tit. 3, c. 1, §§ 2, 5, p. 132; Id. p. 110; Code Comm. art. 262; Jac. Sea Laws, bk. 2, c. 2, p. 144; Harden v. Gordon [Case No. 6,047], and the authorities there cited. Is there any thing then in the present case, which takes it out of the ordinary range of the principles already stated? It is said that the allowance by the maritime law belongs to the seamen only, and cannot be claimed by the master of the ship. The latter, it is said, stands upon different grounds, both as to rights and privileges, from them; and that his own expenses for illness are to be borne exclusively by himself. No authority is cited for this position; and I am not aware, that any exists. So far as the reason and policy of the law go, I can perceive no difference between the case of the master and the case of any of the other officers, or crew of the ship. The interest of the ship-owner is equally promoted in each case by a speedy recovery and return to duty; and the benefit is even of a higher nature, both for the ship and the voyage. The superintending care and control of the master over all the ship's concerns is of the last importance to the interests of the owner. It must be a sad and narrow policy, utterly

at variance with the liberal forecast of the maritime law, to make the master perpetually halt in his duty from the fear of incurring unreasonable personal expenses, and thus endanger the solid interests of the voyage. It is much wiser to leave to his discretion the proper times and occasions, in which he may from illness seek medical aid and other attendance on shore at the expense of his owner, rather than to hazard the great objects of the voyage upon his personal sacrifices out of his own purse for the interest of the whole concern. If such a rule were established in the maritime law, I should be bound to obey it. If not established, I will not be the first judge to introduce it. I doubt exceedingly, whether, as a matter of mere policy, it would be for the interest of the owner to introduce such a stipulation into the contract of the master, where the burthen would be all on one side, and the benefit all on the other. It might tax human ingenuity to invent some other means in the course of the voyage to shift the burthen, or at least to moderate the inequality.

The present, however, is not the case of a master; but of a mate, who clearly in ordinary cases is within the reach of the principle. But it is said, that, upon the death of the master he succeeded to the post of master and ceased to be mate, and therefore is to be treated altogether as if he were duly appointed master. I lay out of the case the approbation and consent of the consignee and the American consul, that the libellant should act as master. They had no authority whatsoever to change his relation to the ship. Upon the death of the master, the mate succeeded to his place virtute officii, by mere operation of law, without any approbation or consent of the consignee or consul. The law throws this duty and obligation upon him; he acts in the stead of the master in all cases, where the latter is dead or absent. He does not cease to be mate in such cases; but he has thrown upon him cumulatively the duties of master. He is still a mate acting as master; not master, but quasi master, with the same general powers and responsibilities pro hac vice. He succeeds, Lord Stowell has said, as haeres necessarius to the employment of the master in a case of necessity. We all know, that here a master is entitled to sue in the admiralty for his wages. And in England, where the master is prohibited so to sue, it is clearly established, that a mate succeeding to the master in the course of the voyage, from the death, or incapacity, or absence of the latter, may still sue for his wages, as mate, for the whole of the voyage, leaving his additional compensation, as master, to be recovered at the common law. So Lord Stowell decided in the case of The Favourite, 2 C. Rob. Adm. 232, and that learned judge thought, upon principle, the whole claim ought to be recoverable in the admiralty; but, from too scrupulous a def-

erence to authority (founded upon no solid reason), he waived exerting his jurisdiction over the whole claim. But the authority there referred to (Read v. Chapman, 2 Strange, 937) admits, in the most decided manner, that the mate, succeeding as master upon the death of the latter, does not lose his distinguishing character as mate. My opinion, therefore, is upon principle, as well as authority, that the mate did not cease to be mate by the death of the master, and succeeding to the command of the vessel; and, retaining his original character, that he is entitled to all the privileges annexed to it, one of which is the right to be cured at the expense of the ship. I make no distinction between the physician's bill and the other charges. Being expenses incurred on shore, they are all equally out of the purview of the act of congress, and all equally within the principle of the maritime law. I give no opinion, how the case would have been, if the physician's bill had been for medical advice and attendance on board of the ship. There is great force in the suggestions of the learned district judge on this subject [Case No. 8,035].

It has been suggested, that a usage has prevailed among merchants in Boston, by which expenses of this nature are made a personal charge on the master, and not on the owner, and by parity of reasoning, that the usage ought to apply to a mate succeeding as master. It is certainly sometimes useful, in order to ascertain what the law ought to be, in new cases open for future decision, to ascertain, what the customs and usages of merchants on such subjects generally are; for such customs and usages may have a material influence as to the rule which ought to be adopted. But, I think, the usages of a particular port or place can never be properly admitted for such purposes. Much less are they admissible, even when general, to control or alter the settled maritime law. The most that can ever be justly allowed to such customs and usages, is to give them effect, when, from their being generally known, and invariably used, as fixed rules, they may be said to constitute a direct and positive element of the particular contract. I have long thought, that too much deference has been allowed to loose and floating customs and usages of this sort, founded on no known principle, and arising more often from ignorance of right, and mere acquiescence, than from any intentional recognition of a fixed rule. In cases of this sort I am not disposed to set up customs and usages against principles of law; or to suffer new inroads to be made upon old doctrines. I am content to stand super antiquas vias; and to go where they lead. There is a great deal of sound sense in the remarks which fell from the court on this subject, in the case of Rankin v. American Ins. Co. of New York, 1 Hall, 619, 631, 632. Lord Eldon has expressed considerable doubts as to the propriety of admitting evidence of usage to explain contracts; and as res integra, he declares himself opposed to it. Anderson v. Pitcher, 2 Bos. & P. 164, 168. See, also, Marsh. Ins. bk. 1, p. 707, c. 16, § 5. Upon the whole, my judgment is, that the decree of the district court ought to be affirmed, with costs. Decree accordingly.