ATLANTA, The. See Case No. 597.

ATLANTA & R. AIR–LINE R. CO., (WILMER v.) See Cases Nos. 17,775 and 17,-776.

---

## Case No. 620.

### The ATLANTIC.

[Abb. Adm. 451.] [1]

District Court, S. D. New York. Feb., 1849.

SEAMEN — LIBEL FOR WAGES — DEFENSES — DISCHARGE BY CONSUL—PROOF—CONTRACT OF SEAMAN—PLEADING—SPECIAL REPLICATION—LIABILITY OF SHIP TO INJURED SEAMAN.

1. Where, in answer to a libel for wages, the claimants set up a discharge of libellant in a foreign port by order of the consul, it is incumbent on them to set forth in their answer a state of facts justifying the discharge relied on, and to support the allegations by adequate proof.

2. The discharge of a seaman in a foreign port (under the acts of February 28, 1803, [2 Stat. 203, c. 9,] and July 20, 1840, [5 Stat. 394, c. 48,]) can be ordered by the consul, only upon the consent of the seaman, given, or proved before him.

[3. Cited in Coffin v. Weld. Case No. 2,953, to the point that the certificate of the consul must show clearly his jurisdiction, and the grounds of his action.]

4. The party relying upon such discharge in defence to an action for subsequent wages, must show the fact that such consent was given.

[Cited in Coffin v. Weld, Case No. 2,953.]

5. To entitle an instrument to the respect accorded to documents under official signature and seal, the signature must be legible, and the impression of the seal sufficiently distinct to allow the vignette and motto to be distinguished.

6. In answer to a libel for wages, the claimants set up a stipulation in the shipping articles in bar of the recovery. The libellant served a replication in the usual form, but contended, upon the trial, that the stipulation relied upon was void. Held, 1. That so far as the claim to treat the stipulation as void might rest upon any matters of fact outside the stipulation itself, the question was not raised by the general replication; but the libellant ought, either by an amendment of the libel or by a special replication, to have introduced into the pleadings averments contesting or avoiding the apparent bar contained in the stipulation. 2. That the question, whether the stipulation was not void in point of law in itself considered, and apart from any extraneous facts, might be raised on the general replication, and should be considered as if it had arisen upon demurrer or exception to the answer.

7. As a general rule, seamen are competent to bind themselves by a contract with the master and owners; and in the ordinary case of a hiring for money wages at a specific rate, the contract of the seamen in respect to the rate will be upheld.

[Cited in The Antelope, Case No. 484; Frates v. Howland, Id. 5,066; Slocum v. Swift, Id. 12,954.]

8. The contract of a seaman in respect to his compensation will likewise be upheld where the mode of compensation contemplated is by a proportional division of the earnings of the vessel among the owners, officers, and crew.

[Cited in The Antelope, Case No. 484; Slocum v. Swift, Id. 12,954.]

9. Shipping articles entered into for a whaling voyage, and contemplating the payment of the officers and crew by "lays" or shares in the vessel's earnings, contained a stipulation that either of the officers or crew who might be prevented by any cause from performing their duty during the whole of the voyage, should receive of his lay only in proportion as the time served by him should be to the whole time of the voyage. Held, That this stipulation would be sustained; even without evidence that special explanation of it was made to the seaman.

[Cited in The Antelope, Case No. 484; Slocum v. Swift, Id. 12,954; The Grace Darling, Id. 5,651.]

10. A mariner receiving injury in the performance of his duty is entitled to be treated and cured at the expense of the ship; and this is equally true, whether his compensation is by specific money wages, or by a share in the earnings of the vessel.

[Cited in Babcock v. Terry, Case No. 702; The Ben Flint, Id. 1,299; The City of Alexandria, 17 Fed. 394; The Lizzie Frank, 31 Fed. 481; The City of Carlisle, 39 Fed. 816; The J. F. Card, 43 Fed. 94.]

11. As a general principle, the liability of the ship in this regard is limited to the reconveyance of the disabled mariner to the United States, or to such period of time as may be reasonable, to enable him to return thither; but this rule is liable to variations.

[Cited in Babcock v. Terry, Case No. 702; The Ben Flint, Id. 1,299; The Lizzie Frank, 31 Fed. 481; The City of Carlisle, 39 Fed. 816; The J. F. Card, 43 Fed. 94.]

---

[1] [Reported by Abbott Bros.]

[12. Cited in Burdett v. Williams, 27 Fed. 117, to the point that a whaling voyage which is not from port to port has never been regarded as within the provisions of Rev. St. § 4520, requiring shipping articles to specify certain particulars.]

In admiralty. This was a libel in rem by George Stotesburg, against the ship Atlantic, to recover wages, and also the expenses of libellant's cure for injuries received during his service on board. The libel stated the following facts: That in July, 1845, the master of the Atlantic, then in the port of New London making ready for a three years' whaling voyage to the Northwest coast, shipped the libellant as green hand for such voyage, on the two hundred and twenty-fifth lay or share of what should be taken by the ship, as the libellant's wages. That the libellant signed the shipping articles, in which the contract was fully set forth. That in August following, he entered upon the service of the vessel, under the agreement, and the vessel, with the libellant on board, proceeded on her intended voyage, and cruised for about seven months, when she arrived at Maui, one of the Sandwich Islands. That on March 16, 1846, the ship being yet at Maui, the libellant, while in the performance of his duty, fell from the maintopsail yard, and was so severely injured that he was taken ashore to the hospital, where he remained confined to his bed for about twenty-one months. That while he was in the hospital, the ship proceeded on her cruise until November, 1847, when she started for home, and on her way touched at Maui, and took the libellant on board, and then proceeded to the port of New London, where she arrived April 20, 1848; having taken a cargo of which the two hundred and twenty-fifth part claimed by the libellant was averred to be of the value of $300 and upward, which he claimed to recover from the ship. The libel further stated, that by reason of the injuries received by libellant in his fall, he had lost the use of one of his legs, and one of his arms had been rendered almost useless; that he had already incurred great expense for medical advice, and must incur still more before he could be fully restored; and he claimed to recover from the ship "his reasonable expenses already incurred, and hereafter to be incurred in his cure, and his reasonable support since his injury and till he shall be cured."

The answer stated that the libellant shipped on board the Atlantic as alleged in the libel, except that he shipped as carpenter's mate instead of green hand, and that no limit of three years or otherwise was set to the duration of the voyage. The answer then set up as a defence to the claim for wages a clause in the shipping articles, which was in these words: "It is also further agreed between the owner of said ship Atlantic on the one part, and the captain, officers, and crew on the other part, that if the captain, officers, and crew, or either of them, are prevented by sickness or any other cause from performing their duty during the whole of said voyage in said ship Atlantic, that any of them so falling short, shall receive of their lay or share in proportion as the time served or duty performed by them is to the whole time said ship is performing her voyage." And it was also charged, in respect to the injury received by libellant, that the accident with which he met was not occasioned by his being engaged in any unusual duty, or by any agency or through any fault of the master, or of any officer of the ship, but through want of sufficient care on the part of the libellant. The answer further showed, that on the libellant's being placed in the hospital at the port of Lahaina, at Maui, the libellant was discharged from the ship with his own consent, and by the authority of the United States consul at the port. That the master of the ship then produced to the consul the list of the ship's company certified as required by law, and paid to the consul $36, being three months' wages of libellant, for which the consul gave his receipt, together with his certificate that the libellant had been discharged from the ship according to the laws of the United States. That on the return of the vessel to the port, the United States consular agent put the libellant on board the ship as a sick and disabled seaman, to be carried as passenger to the United States, and that he was so received and brought home. The answer further stated that advances had been made to the libellant, which more than paid the amount due him upon his lay or share under the stipulation in the shipping articles before mentioned.

To this answer the libellant filed only a general replication in the usual form. The cause was heard upon depositions and documentary evidence; the important points of which are adverted to in the opinion of the court.

Burr & Benedict, for libellant.

I. The rule of the maritime law is well settled from the earliest periods, that a seaman taken sick shall be cured and tended at the ship's expense, and have his whole wages; if he be hurt in doing his duty, and in rendering services to the master or the ship, he must be cured and indemnified at the expense of the ship; if he be disabled for life in defending himself or the ship, he must be provided for, for life, at the ship's expense. Cleirac, 25, on article 6 of Laws of Oleron; Laws of Oleron, arts. 6, 7, [Append. Fed. Cas.,] of Wisbuy, arts. 18, 19, [Append. Fed. Cas.;] of Hanse Towns, art. 39, [Append. Fed. Cas.;] Pardessus, passim; 1 Valin, 721; 2 Valin, 167; 2 Boulay-Paty, §§ 9–11, tit. 5; Abb. Shipp. 622, 624, note; Harden v. Gordon, [Case No. 6047;] The

George, [Id. 5,329;] Reed v. Canfield, [Id. 11,641;] The Forest, [Id. 4,936.]

II. This law is dictated by humanity and policy. "The Spaniards are the most unkind and indeed unjust to their sick mariners of any people, for they neither pay them any wages, nor maintain them, unless they pay others to serve in their stead." 1 Pet. Adm. Append. 107, note; Sea Laws, 203; Translation of Cleirac, note to article 45 of Laws of Hanse Towns. "Public policy, as well as the ordinary claims of humanity, demands that the interests of the seaman should be linked, in these respects, to those of the ship." The George, [supra.] All the ancient codes and their commentators, and the uniform current of modern decisions, agree in the rule and the reasons of it.

III. The claimants, however, insist that the rule is confined to seamen who ship by the month, and does not apply to seamen on whaling voyages, whose wages are usually a share of the profits. It is not easy to see how the mode of hiring should alter either the humanity or the policy of the law, or in any manner change the rule. In length of voyage,—in absence from friends and the comforts of civilized life on shore,—in purely maritime service, and perils, and hardships, —in the great profits and national benefits which result from his labors,—and in the necessity of being kept in good condition, the whaling seaman is the mariner par excellence.

IV. A participation in the profits of the voyage is believed to have been originally the mode of compensation of mariners in all employments, and by degrees the capitalist took the profits, and the mariner had fixed wages; but in the fisheries the original and primitive plan has always prevailed with modifications. In the time of Cleirac there were six' modes or hiring mariners. 1. By the voyage or by the run—a fixed sum. 2. By the month, week, or day. 3. By the distance—so much a mile or league. 4. By a share of the freight. 5. By the right to put so much freight on board belonging to themselves or others. 6. The most common—part in money and part in the right to put freight on board. Cleirac, 38, §§ 32–34; Laws of Oleron, arts. 19, 28, 29. All the cases in which mariners are spoken of, in the codes and elsewhere, make no distinction in their rights and duties, depending on the mode of payment. Pardessus, Lois Mar. passim; Laws of Oleron, art. 19; Laws of Wisbuy, art. 35; 1 Pardessus, 382, 485. Their rights belong to them as "mariners," "matelots," and not as paid by the month or otherwise.

V. The whaling business existed before the codes and the commentators. The Biscayans were the first people who prosecuted the whale fishery as a regular commercial pursuit. They carried it on with great vigor in the twelfth, thirteenth, and fourteenth centuries. Encyc. Am. art. Whale-fishery.

The whale-fishery is one of the oldest, most profitable, and purely maritime commercial pursuits. Cleirac, in his notes to article 44 of the Laws of Oleron, (page 119,) devotes more space to this subject than to any other in his whole commentary. Twelve closely printed and interesting pages are devoted to the history, mode of conducting, and commercial importance of this great maritime pursuit. It was conducted then, as now, on shares. Not only the men in each vessel were paid in shares, but several vessels often went on shares. Those who pursued it were always subject to the maritime law, and to the jurisdiction of the admiralty, except in England, since the masters of the English admiralty have prohibited it from exercising its jurisdiction. 2 Valin, 794; Curt. Merch. Seam. 71, 353.

VI. "Although seamen in whaling voyages are compensated by shares of the proceeds, this compensation is always treated as in the nature of wages. They are never deemed partners, although they may be said to partake of the profits of the voyage. The apportionment of the proceeds is only a mode of ascertaining their compensation." Reed v. Canfield, 1 Story, 203, 204, [1 Sumn. 203, 204, Case No. 11,641.] This was a case of a seaman injured on a whaling voyage, and shows that the modern rule, like the ancient one, extends to whaling seamen as well as others.

VII. It is said, however, that the mariners contracted in the articles that they should not be paid for time lost by sickness. The clause in the articles is a most extraordinary one. 1. Its inhumanity and impolicy in connection with whaling voyages is most manifest. It leaves the sailor after eight months' service sick and unprotected, 12,000 miles from home, on an island in the sea, without a dollar. It makes it the pecuniary interest of the officers to have the men sick, or to disable them, or confine them, or disrate them, or put them off duty, during that large portion of the voyage when there is little to do. It makes it the interest of the seaman to shrink from peril and exposure. Every accident or a cold must cost them a portion of their lay. 2. It also makes the measure of compensation two things which cannot be correctly measured—relative health and labor. How long must he be sick, and how sick, and how much labor shall he fail to do? Shall every hour be deducted, or must it run to a day, a week, or a month? Shall every headache, and stiff joint, and swelled finger, that impairs his efficiency, take away a portion of his wages?

VIII. Courts of admiralty are in the habit of watching with scrupulous jealousy every deviation from the principles of the maritime law; and when any stipulation is found in the shipping articles which derogates from the general rights and privileges of seamen, courts of admiralty hold it void, unless the-

nature and operation of the clause be fully and fairly explained to the seaman, and an additional compensation is allowed. Brown v. Lull, [Case No. 2,018;] The Juliana, 2 Dod. 504; 2 Mason, 541, 556, [Harden v. Gordon, Case No. 6,047;] 3 Kent, Comm. 193; The Minerva, 1 Hagg. Adm. 347; Abb. Shipp. 609, § 3, and 610, [Johnson v. The Walterstorff, Case No. 7,413,] note, and cases cited.

IX. It is not material whether the articles be in the usual form, or what is the custom of New London. It is the departure from the principles of the maritime law, and the general rights of seamen, and not the departure from the usual form of articles, or from the custom of a particular place, that avoids the clause. All articles are stuffed with void clauses. Abb. Shipp. p. 609, § 3; The Minerva, 1 Sumn. 158, [1 Hagg. Adm. 347;] Curt. Merch. Seam. 57, note.

X. There is no evidence that the articles were explained to the libellant, nor that he received any additional compensation, nor that he knew of any custom or was bound by it. It is not to be presumed from his signing articles at New London. Harden v. Gordon, supra; 1 Sumn. 158, [The George, Case No. 5,329;] [Rankin v. American Ins. Co.,] 1 Hall, 631, 632.

XI. This clause may be construed consistently with the maritime law. The court will therefore so construe it. 1. It may reasonably apply only to cases in which seamen, from sickness or other cause, needlessly or wrongfully, or by consent of the consul, leave the service before the voyage is up,—or only to provide that in cases in which a seaman for any cause should not be entitled to be paid for the whole voyage, that he should be paid his share of the whole voyage ratably to the time, and not be entitled or restricted to his share of what was taken before he left. 2. Does he not do his duty who does all he can? By either of these constructions, the rule of the maritime law is unimpaired, and the libellant is entitled to recover his entire wages.

XII. There is nothing in the articles to impair his right to recover the indemnification for the injury received in the services of the ship. That stands under the maritime laws. The clause in the articles only relates to wages.

XIII. The alleged discharge of the libellant in Maui the morning after the accident is not proved. The consular certificate is not evidence of a discharge. It is only a certificate that the seaman was left there sick, to save the captain's liability on his bond to the collector if the ship should not return to Maui. The consul has no jurisdiction to discharge a man except in cases of joint application or consent, of which this does not appear to be one, there being no pretence of any consent, and the man was not in a situation to consent, and it would have been brutal to ask him.

Asa Childs, for the claimants.

I. The libellant's claim is founded on the special contract. He does not set up the relation of a mariner to the ship, and claim wages, and the expense of his cure from the ship, as the result of that relation in virtue of the maritime law; but he sets up this contract, alleges he signed it, and making it the ground of his claim, asks the court to decree its specific performance, and give him his share of the products of the voyage. 1. Now, either the contract is in force or it is not. If it is not in force, or is abandoned, then it is certain this action cannot be sustained. If it is in force, then the duty of the court is to ascertain its import, and giving it a fair legal construction, to enforce it. But in respect to compensation, the rights of seamen are and always have been matters of contract. The maritime law, like the common law, will imply a contract to pay wages, in the absence of an express contract, upon the principle of a quantum meruit, but it leaves parties free to make their own contracts, and when there is a contract made it will enforce it. The whole regulation as to shipping articles rests upon this recognition of the right of parties to make contracts. 2. Whatever may be the rules of the maritime law as to the rights of parties, it is perfectly well settled that they may be controlled by special contracts in respect to the parties themselves. 1 Pet. Adm. 113, [Thompson v. The Catharina, Case No. 13,-949;] 1 Pet. Adm. 186, [Relf v. The Maria, Id. 11,692;] 1 Pet. Adm. 214, [Jameson v. The Regulus, Id. 7,198.] 3. It is not denied that the contract, to be valid, must be fairly and honestly made. But the law as to seamen is in this respect the same as the law as to other men. Acts of oppression, cunning, deception, introduced into contracts, courts will protect the parties against. Inequality in terms, disproportions in bargains, sacrifice of rights on one side only, not compensated by benefits on the other, courts will pronounce unjust, and regard as evidence of fraud. 4. All the rules as to the illegality of provisions inserted in shipping articles, and all the grounds for showing special favor to seamen by courts, rest upon either their liability to be imposed upon, in consequence of their peculiar relation, or actual fraud practised upon them. But even in the extreme cases, if the contract is fairly made, the parties are bound by it.

II. The contract now under consideration can be affected by none of the principles referred to. It is not a contract imposed upon seamen by the master or owners of a ship. It is in the nature of a copartnership. Abb. Shipp. (5th Amer. Ed.) 915. The owners, officers, and men have associated to pursue a particular business. The owners furnish the ship, the officers and men agree to do the work; and they are all by their agreement to be interested jointly in the whole enter-

prise. They all unite in a mutual covenant, and for their own protection submit to the authority of the captain, and prescribe their own terms of interest. The men are not laboring for the owners, but for themselves, as much so in every sense as the members of a mercantile firm. The business in which they engage is not a trading voyage, but rather a manufacturing business. Except the time spent in passing from port to their fishing ground, they are engaged in the actual labor of procuring oil and bone, &c. The early business of catching whales and other fish was carried on by companies collected in tents on the shore, and had no connection with shipping business whatever. The peculiar rules adopted in maritime ports for the regulation of seamen in trading voyages —men employed simply to navigate ships— cannot be applicable to such an association as this.

III. This contract was fairly made. It is in the form used at the port where made by every company engaged in the business for thirty years. It is free from all suspicious circumstances. It is signed by the libellant, who writes a good hand, and furnishes evidence of having been understandingly executed. There is no pretence of unfairness. The captain and officers are all subject to the same rules, and have signed the same articles.

IV. The contract is reasonable in its terms, and equal as respects all parties. Every man is to receive the fruit of his own labor for the time he shall perform his duties. In a trading voyage from port to port, where the seamen take charge of the owner's ship, and expose themselves to danger for his exclusive benefit, there may be a reason and it may be just that he receive his wages from the owners, though sick. But this is not such a voyage. The voyage is without limit; the crew are to engage for themselves, as well as the owners, in a particular enterprise, to work as long as circumstances shall seem favorable. If a man fails to continue with his associates, and another person is procured in his place, the loss should be his own, and not fall upon his associates. At any rate, a contract so providing is not unjust or unreasonable. It is not just, it is not right, that the earnings of others should be transferred to him. The question is not, what shall be done to cure a sick man; but the question is, can it be said to be an unreasonable provision in a contract that he shall not, as a pecuniary interest, receive the fruit of other men's labors. Bear in mind this is not a claim against owners of the ship for wages, but against the associates in the enterprise, to obtain a part of their earnings.

V. The principle adopted by Story, in 2 Mason, 541, [Harden v. Gordon, Case No. 6,047,] and 2 Sumn. 449, [Brown v. Lull, Case No. 2,018,] that where a contract imposes unusual hardships on a seaman without extra compensation, or deprives him of rights secured by the mercantile law, the court will presume the contract to be fraudulent, does not apply to this case. No such unusual hardships are imposed, no ordinary rights are taken away. This contract stands like every other contract brought before the court, presumed upon well-settled principles of law to be fair till the contrary is shown. Admit that a contract on its face apparently unjust imposes upon the party who sets it up the burden of proving it to be fair. This contract contains no provision which justifies any presumption against it.

VI. As to the claim of the libellant, that he is to be cured at the expense of the ship, no question of any practical importance can arise. He was placed in the hospital at the Sandwich Islands, and all the expenses paid by the captain. He was brought home at the expense of the United States. His board bill and his surgeon's bill at New London, and all his expenses, were paid by the owners.

VII. The libellant was discharged according to law at the Sandwich Islands, and this would be conclusive against his claim to be cured at the expense of the ship. 1. The consul had a right to discharge him. Act July 20, 1840, (5 Stat. 394.) 2. His certificate is that he was discharged according to law. 3. The presumption of law is that a public officer has done his duty. 4. The payment of $36 is confirmatory evidence that the consul discharged him according to law. 5. His sending him home as a disabled seaman proves that he was discharged.

BETTS, District Judge. The libellant shipped at New London in July, 1845, as carpenter's mate, on a whaling voyage. In consequence of injuries received by him, in the discharge of his duty, he was taken on shore in the port of Lahaina, in the island of Maui, one of the Sandwich Islands, and left in the hospital there. The ship proceeded on her voyage, and after completing her cruise, touched at Maui, on her return home, and received the libellant on board, he being placed there as a sick and disabled seaman by the consul, and was brought to the United States, the master receiving $10 passage money from the consul therefor. The libellant now demands wages for the whole voyage, together with the expenses of his cure. There are disagreements in several particulars between the statements of the libel and those of the answer, but they do not essentially affect the points upon which the cause turns, and accordingly no time will be spent in the consideration of them.

The questions in the case are three:—Was the libellant discharged from the ship at Maui, so as to terminate the shipping contract, and exempt the vessel from all further liability in consequence of his shipment? Was the condition contained in the shipping articles, limiting the libellant's compensation or wages to the time he was ac-

tually on board and capable of rendering the services he contracted to perform, a legal condition and obligatory upon him? Is the ship chargeable with the expenses of the libellant's cure? and if so, to what extent?

1. It is incumbent on the claimants to set forth in their answer, a state of facts justifying the discharge of the libellant in a foreign port, and to support the allegations by competent and sufficient proofs. They plead that the libellant, on March 16, 1846, fell from the topsail yard of the ship through want of sufficient care on his part, and was so severely injured by the fall, and became so sick in consequence of it, that he was rendered unable to perform his duty on board, and was, at his own request, and by order of the captain, and by aid of the consular agent, placed in the hospital. That on March 18th, he was discharged from the ship by his own consent, and by the consent and authority of Giles Waldo, the United States consul at that port, the master of the ship having produced to the consul the list of the ship's company, certified according to law, and having paid to the consul the sum of $36, being three months' wages to the libellant. The evidence to support this discharge is a certificate,—represented to be under the consular seal, but the impression of the seal is too faint to admit of its being deciphered, —attached to the articles, and expressed in these terms:—

"United States Consular Agency, Lahaina, Hawaiian Islands. I, the undersigned U. S. consular agent, do hereby certify, that George Stotesburg has been discharged from ship Atlantic on account of sickness and in accordance with the laws of the United States. Given under my hand and seal this 18th day of March, 1846. Giles Waldo, U. S. Consular Agent. By A. H. Linigsyez," (or some other similar name, not easily determined from the signature.) On another paper a memorandum or account is made in this form:—"Ship Atlantic and owners to U. S. consulate.

| | |
|---|---|
| 3 months' wages to Stotesburg | $36 00 |
| Certificate | 2 00 |
| | $38 00 |

"Rec'd payment, (Signed as above.) Lahaina, March 18, 1846."

These papers are all the evidence produced to support the allegation of the answer, that three months' wages had been paid to the commercial agent, and that the discharge had been given under the authorization of the act of congress of February 28, 1803, (5 Stat. 396.) The discharge, however, manifestly was not made in conformity with the provisions of the statute; for the cardinal requisite to the exercise of that authority is, that application for the discharge shall be made by both the master and mariner; and it is not even certified that the consular agent acted on any such application; on the contrary the proofs import that the libellant

was sent ashore by direction of the master, and under expectation that he still remained connected with the vessel as if he had continued in her. The court cannot assume that the assent of the libellant to his discharge was given, merely upon the fact of his being left in a hospital in his then maimed and dangerous condition; nor upon the assertion of the person acting for the consular agent that the libellant was discharged from the ship in accordance with the laws of the United States. It is unnecessary to inquire, whether an averment in such certificate that consent was given by the seaman and master in the presence of the consul, or was proved to him, would justify the discharge without other evidence of the fact, because the certificate contains no such allegation. Indubitably the particular which gives authority to consuls to act in this behalf under the statute, must be duly established, or his proceedings will be a nullity. This is a special power and trust confided to consuls and commercial agents, and must be exercised by those officers strictly in pursuance of the directions of the statute. Nor can the payment of $36 wages made to the consul by the master, be accepted as a payment of the three months' wages prescribed by the act. The hiring was for a share of the takings on an entire whaling voyage; and the rate of the lays could not, by the method of apportionment appointed in the articles, be applied with any justness to the period of service which had then elapsed. The vessel was on her outward cruise to the fishing grounds, and it would be evidently unjust to measure the compensation of the libellant by lay shares out of the chance takings on that part of the cruise. The takings of the entire voyage was the basis upon which the libellant's share should be computed. Twelve dollars per month was evidently adopted as an arbitrary allowance of wages. It might chance to be more advantageous to the libellant than his lay of the earnings of the adventure, apportioning the time he was in the ship with the entire duration of the voyage. Still, it might be disproportionately short of his share. And it certainly was not competent to the master and consular agent to determine that matter without the clear understanding and concurrence of the libellant. I think, therefore, there is not in this discharge that conformity with the requirements of the act of 1803, which will uphold it to protect the ship. Jay v. Almy, [Case No. 7,236.] [2] The act of July 20, 1840, (5 Stat. 394, c. 48, §§ 5, 6, 9,) empowers consuls and consular agents abroad, to discharge seamen from their contracts or their ships, and to exact the payment of three months' wages, or even more, or to dispense with it as in their judgment they may think expedient. This power can

[2] Compare Hutchinson v. Coombs, [Case No. 6,955;] also, Minor v. Harbeck, [Id. 9,629.]

be exercised but in two cases,—upon the application of both the master and the mariner, or upon that of the mariner alone. The master can act in the matter only jointly with the mariner. And it is not enough for the consul to certify that he gave the discharge "lawfully," or that he gave it "in accordance with the laws of the United States." It must be made to appear upon what grounds he proceeded. The court cannot intend that it was on the joint request of the master and seaman; nor that it was on the sole application of the latter, nor even that one or other ingredient of fact actually existed. The power imparted to consuls is limited and specific in character, not appertaining to him virtute officii, but conferred by a statutory provision; and the law raises no presumption or intendment in support of his doings, until it is shown that his jurisdiction attached to the subject,—that a case had occurred falling within the scope of his powers. The rule is coeval with the existence of statutory or limited tribunals or officers, that their doings must be made to appear to be within their authority, and that nothing can be supplied in support of their jurisdiction by intendment. 1 Co. Inst. 117; 2 Coke, 16b; 1 Lil. Abr. 371; 1 Lev. 104; Powers v. People, 4 Johns. 292; Adkins v. Brewer, 3 Cow. 206; Grignon v. Astor, 2 How. [43 U. S.] 319; Bennett v. Burch, 1 Denio, 141. Nor is it sufficient for the officer to aver ever so positively his jurisdiction. He must set forth the facts necessary to confer it, and those jurisdictional facts must be established by proof. The People v. Koeber, 7 Hill, 39, and cases cited. I do not discuss the question raised respecting the sufficiency of the proof, that Giles Waldo was the consular agent of the United States at Lahaina, or that the gentleman who has subscribed the act for him, was his legally authorized substitute. Admitting that the seal of the consulate imports a legal authority in the person using it to do all official acts appertaining to the office, still the case calls for the remark, that the papers should present a distinct impression of a seal so that it may be identified and discriminated. The paper before the court does indeed bear a faint similitude of a seal, but neither vignette nor motto is distinguishable; and the vague flourish employed for a signature, affords no means by which the authentication of the discharge can be verified.[3]

2. To meet the claim for wages during the period of the libellant's disability, the answer sets up a stipulation in the shipping articles signed by the libellant, whereby it was agreed that if either of the officers or crew should be prevented by sickness or other cause from performing their duty during the whole of the voyage, he should receive of his lay or share only in proportion as the time served or duty performed by him should bear to the whole time the ship should be in performing the voyage. A general replication to the answer is filed by the libellant, which has only the effect to put both parties to the proof of the allegations in their respective pleadings not admitted to be true, (Dist. Ct. Rules, 88;) or of permitting the cause, when the answer operates as a plea in bar, to be set down for hearing upon the libel and answer alone, (Dist. Ct. Rules, 78.) That rule allows the libellant to treat the answer as a plea in bar, and by so replying to it, save himself from the consequences of admitting its truth, which he would do in effect by setting it down for hearing on a general replication. It may admit of question whether the supreme court rules (rule 27) do not, by fair implication, take away the right of a claimant or respondent to interpose a formal plea or demurrer on the merits to a libel or information in admiralty, and whether he is not limited to a defence by answers alone. See Sup. Ct. Rules, 27. The rule, however, does not import that he can interpose no other defence than a denial or admission of the facts. The facts may be undisputed, and yet supply no cause of action; or the defendant may be able to adduce other facts avoiding the effect of those alleged by the libellant, or he may possess matter of estoppel and bar which the court could never intend he should be precluded from using, without his being also compelled to make formal denial of the facts set up by the libel. Certain Logs of Mahogany, [Case No. 2,559;] Pratt v. Thomas, [Id. 11,377.] The provisions of the supreme court rule must be deemed satisfied if the defendant, whether or not required by the libel, replies to the allegations in the libel by a full and explicit answer. The special replication authorized by the district court rule, may thus be urged to create a triable issue upon the merits. This is the practice in equity. Sup. Ct. Rules, Equity. There would be equal conveniency and fitness in applying it to pleadings in Admiralty.

The supreme court rules indicate no method of pleading applicable to such case, unless it be embraced in the right to amend the libel. Rule 24. That would necessarily lead to a new answer, and would by no means further the simplicity in pleading which was regarded by congress as an object of cardinal importance in authorizing the supreme court to regulate Admiralty proceedings. Act Aug. 23, 1842, (5 Stat. 518, § 61.) In the summary of the practice of this court, it is stated that the replication to an answer as to a plea, may, in case of urgent importance, be special or double; but ordinarily it should take a single issue upon the allegations of the answer, however multifarious those may be. Betts, Adm. 50. The practice in the Dis-

---

[3] That a regular and valid consular discharge, properly certified, is conclusive on all points duly passed upon by the consul, unless his conduct be proved corrupt or fraudulent, see Lamb v. Briard, [Case No. 8,010;] Tingle v. Tucker, decided April, 1849, [Id. 14,057.]

trict of Louisiana appears to be essentially to the same effect, (Waring v. Clarke, 5 How. [46 U. S.] 441,) but in general, special replications to answers would not seem to be in use, in American Courts of Admiralty, unless demanded by the libellant, (Dunl. Adm. Pr. 197; Coffin v. Jenks, [Coffin v. Jenkins, Case No. 2,948.]) It is otherwise in the English Admiralty, although an eminent compiler appears to regard the practice as irregular. 2 Browne, Civil & Adm. Law, 365, 415. Pleas in bar may be interposed, with the right to plead generally afterwards, (The Sarah Jane, 7 Jur. 659, 2 W. Rob. Adm. 110;) and a reply or rejoinder contradictory to the allegations in the answer, or setting up new matter, are of constant use in the English Admiralty. The Aurora, 1 W. Rob. Adm. 325; The Anne and Jane, 2 W. Rob. Adm. 104; The Hebe, Id. 146, 152.

Manifestly, then, the libellant ought to have introduced into the pleadings, either by an amendment of the libel after the answer was interposed, or by special replication to this branch of the defence, such averments as were necessary to enable him to contest or avoid the bar to his recovery supposed to be contained in the stipulations of the shipping articles, which he admits he signed and that they contain the true contract with him. His counsel, however, insist that he has a right to treat the engagement as a nullity, without alleging any facts impugning it; and that the court, as matter of law, must pronounce an agreement of that description, entered into with a mariner, to be nugatory and void, in respect to him. In considering the question thus raised, I shall regard the objection urged to the defence founded upon the stipulation, as if it arose upon demurrer or formal exception to that part of the answer. It is not to be denied that a common sailor is competent to make a shipping contract. Indeed, the statutes of both the United States and England imperatively impose on masters the duty of entering into contracts in writing with seamen employed by them. And the acts of congress clearly imply that such contracts will be valid although operating to the disadvantage of the mariner even in their most essential feature,—the rate of wages,—for they make that a particular which must be stipulated, and on omission by the master to have a written contract, they give the mariner a chance of higher wages than he may have bargained for verbally, by allowing him to demand the highest current rate at his port of shipment. Act July 20, 1790, (1 Stat. 131, c. 29, § 1;) Act July 20, 1840, (5 Stat. 395, § 1, arts. 3, 10, 19.) The written or printed shipping articles must now "contain all the conditions of contract with the crew as to their service, pay, voyage, and all other things." Act July 20, 1840, (5 Stat. 395, § 3.) It is remarkable, that the act of congress of July 20, 1790, in specify-

ing the constituent parts of a contract with seamen, should omit the rate of pay or wages he was to receive. By the provisions of that act the agreement must "declare the voyage or voyages, term or terms of time for which such seaman or mariner shall be shipped." Section 1. The act of July 20, 1840, assumes that the rate of wages is a component part of shipping articles, (section 3,) and the courts, previous to that enactment, always enforced against masters of vessels the obligation to stipulate the rate of pay as an essential part of the written contract. Bartlett v. Wyman, 14 Johns. 260; Johnson v. Dalton, 1 Cow. 543; 3 Kent, Comm. (4th Ed.) 177; Gilpin, 305, [U. S. v. Twenty-Three Coils of Cordage, Case No. 16,-573;] Gilpin, 452, [Wickham v. Blight, Case No. 17,611.] The English statutes moreover are precise and unequivocal upon this point. Abb. Shipp. 607. See 3 Kent, Comm. 196, note c, where a summary of the last English act is given. The English and American admiralty have, in many instances, interposed to protect seamen against stipulations introduced into shipping articles, not demanded by statute, and which were in abridgment of their rights under the law maritime, and where no adequate compensation was secured them as an equivalent for the rights relinquished. Abb. Shipp. 722; Curt. Merch. Seam. 44; 3 Kent, Comm. (6th Ed.) 193, note. But they have uniformly held that the shipping articles are conclusive as to the wages, where no fraud or deception is proved.

Upon these principles it would seem to result, that the mariner can act in forming a contract for wages or compensation with the same authority, and can bind himself to the same degree as any other contracting party, where specific wages for a period of time, or for a voyage or cruise are agreed upon, or where any other special mode of compensation is adopted. The Sydney Cove, 2 Dod. Adm. 11; The Mona, 1 W. Rob. Adm. 137; The Riby Grove, 2 W. Rob. Adm. 52; The Mariner's Case, 8 Mod. 379; Howe v. Nappier, 4 Burrows, 1944. The law has established no distinction which goes to invalidate his contract when coupled with conditions or qualifications to his right to recover the stipulated wages in full. The courts have gone no further than to declare that they will scrutinize agreements to the seaman's prejudice, which are outside of the statutory requirements, or unusual in shipping articles; and will absolve the mariner from them unless it is proved by the master or owners that he clearly understood their character, and was secured a compensation correspondent to the disadvantages or restriction imposed upon him. 3 Kent, Comm. 193, and note; Abb. Shipp. 722, and note. With this limitation the contract operates in respect to the mariner with no less efficiency than upon the owner. Contracts for wages in money have become al-

most exclusively those now employed in general navigation by commercial nations. 3 Kent, Comm. 185. Shipping agreements are accordingly greatly simplified in comparison with what might be required were seamen now accustomed to be rewarded, as in the earlier periods of commerce, out of the freight or profits of the voyage, or by their own ventures on board. In defining and fixing the metod of compensation in such cases, agreements might be required or appropriate, which should make the mariner's right to a full share, or to any share of the ship's earnings, dependent upon circumstances which ought not to affect a contract for money wages. I do not find, in looking carefully through the ancient ordinances of maritime countries, any inhibition upon the right of a master or owner to make special contracts with seamen in voyages for freight or profits, or any exoneration of seamen from the obligation of their special agreements in relation thereto. Both parties were considered as acting in concert and by mutual consent in arranging the terms upon which the voyage was to be undertaken and in conducting it after it commenced, (Laws of Oleron, art. 16; Laws of Wisbuy, art. 32,) and as having a common interest in the direction of the vessel, (Laws of Oleron, art. 21.) In all critical emergencies the advice or opinion of a major part of the ship's company determined the matter. Laws of Oleron, art. 2; Wisbuy, arts. 14, 21. The laws secured to seamen certain advantages of venture or portage in shipping portions of the cargo on their own account, (Laws of Oleron, art. 16; Wisbuy, art. 30; 1 Pardessus, Lois Mar. 336; Lubeck, art. 10; Hamburg, art. 9,) and the privileges were sometimes in addition to money wages; at other times they constituted the entire compensation, (3 Pardessus, 340.) These provisions denote that the mariners, in a common adventure, had a concurring voice with the owners and master in controlling its management, and could regulate, at their own discretion, the privileges they were to have in the voyage. No intimation is made that they were under tutelage or disabilities in that respect, so that their engagements would be voidable if varying from the familiar formula adopted in money hirings. Whaling voyages, as conducted in England and in the United States, form a species of navigation bearing considerable similitude to the ancient method of rewarding seamen by shares of freight earned, but very little, if any, with the system of employment on money wages, which forms the basis of ordinary shipping agreements. They are held not to be strictly copartnerships, (Abb. Shipp. 705; The Phebe, [Case No. 11,064;] 3 Kent, Comm. 185;) yet they are mutual concerns, involving an entire reciprocity between owners and mariners in respect to the profits and losses of the adventure, (1

Boul. P. Dr. Com. 197, § 7; Cleirac, Cout. de la Mer, 66, note 2.) They result in communities or associations, in which each and all take a common risk, and are mutually entitled to a profit. The owner supplies the ship, her equipment, and stores, and the officers and crew contribute their services, and an agreed ratio of remuneration out of the earnings of the enterprise is allotted to these respective interests. The proportions in this distribution will, from the nature of the case, be exceedingly dissimilar, and are invariably the subject of express agreement, because not a matter capable of adjustment by the courts on any principle of legal or equitable merits between the parties.

It is somewhat singular that an interest of such magnitude in this country as the whaling business, should not have been regarded by congress as deserving regulation by law as much as fishing voyages, or ordinary trading ones. No statute has, however, fixed the rights of parties in these adventures, or required their agreements to be in writing. Chancellor Kent is mistaken in supposing that the act of June 19, 1813, (3 Stat. p. 2, c. 2,) applies to whaling voyages. 3 Kent, Comm. 178. It is limited to the bank and other cod fisheries. But a species of usages, adapted to the necessities of these adventures, are growing into practice, which the courts seem disposed to favor, and which may soon acquire the character and usefulness of authoritative ordinances. Curt. Merch. Seam. 394, App. 2; Barney v. Coffin, 3 Pick. 115; Baxter v. Rodman, Id. 435. The contract brought before the court in this case is a fair representation of the terms upon which these engagements are usually arranged. If the limitation of the rights of the crew to shares in those takings only which they have aided in making be not of general use, the stipulation would seem in itself reasonable and appropriate, if entered into by the mariner with an understanding of its purport and aim. The exception taken in this case to the argument does not go to the provision as in itself inadmissible, but the scope of the objection is, that the stipulation is void for want of proof on the part of the owners that the libellant had it clearly explained to him, and that he was secured an equivalent for a general right to wages for the voyage surrendered by this clause of the engagement. There are facts in evidence affording a strong implication that the libellant well understood this provision. The vessel was fitted out in the port of New London, and it is proved that for a long period of years a like condition has been introduced into shipping articles signed at that port, and that for twenty years, or more, voyages have been made up and settled there upon that basis. The libellant, in his libel, evinces a familiarity with the contents of the shipping articles, as he asserts that his contract is fully set forth in them. He was a mechanic,

a carpenter's mate, shipped at New London, and joined the vessel there; and in the absence of all evidence to the contrary, it will be implied that he was a resident of that place or vicinity, and he must be deemed cognizant of so old and notorious a custom in the line of business in which he engaged. His handwriting indicates a good education, and as he took a rate of wages above that of green hands and ordinary seamen or cooper's mate, and equal with that of seamen, it is also fairly inferable that the particulars of his compensation and the circumstances likely to affect it, were ascertained and particularly attended to upon his part. But, in my opinion, the stipulation is not of that unusual or extraordinary character that any explanation of it to the libellant was requisite. It clearly was the customary one at that port, and it seems to be exactly adapted to the character of the adventure in which the parties were about to unite upon a ground of common interest. Upon the basis of recompense adopted, each party would be solicitous to secure the whole advantage of his own labor, and to prevent others from participating in profits and earnings towards which they had contributed no aid. There was a legal and equitable equivalent for the engagement in its mutuality. It applied alike to officers and crew. Those who were to receive large shares and those whose portions were the smallest reciprocally surrendered and acquired like rights under it; and it is to be observed, that although the libellant was entitled to a precedence over portions of the ship's company, other portions had reserved to them much larger shares than his own. His chance of gain might thus, by their shares falling into the distribution fund, counterbalance his risk of loss. The adventure was in its nature one of hazard, and each person would naturally compute the chances as more likely to turn in his favor than against him, and would accordingly regard the stipulation as promising an advantage to himself. I shall accordingly hold that the engagement was valid, and that the libellant cannot claim any part of the takings earned during the period of his disability.

3. The remaining question is, as to the liability of the ship in this peculiar engagement, to bear the charge of the libellant's sickness and cure. The general principle applicable to the rights and liabilities of seamen is, that the shipping contract is presumed to include the provisions of the law maritime, except as varied or modified by express stipulation between the parties. The Crusader, [Case No. 3,456;] Jameson v. The Regulus, [Id. 7,198;] Curt. Merch. Seam. 106. A fundamental doctrine applicable to mariners' contracts, and one regarded in the maritime law as forming a part of the contract, is the right of the seamen to be cured at the expense of the ship, of sickness or injury received in the ship's service. Jac. Sea Laws,

144; Abb. Shipp. 258; Curt. Merch. Seam. 106, 111. Pardessus, in his compilation of marine ordinances and laws, collects the provisions upon this subject embodied in those edicts and usages. 1 Pardessus, 327, 471, 474; 2 Pardessus, 521; 3 Pardessus, 141, 374, 510, 518. See, also, 1 Boulay-Paty, 202. Valin comments upon the import of several of the ancient ordinances which are embraced in article XI. of the Ordinance of the Marine of Louis XIV.; and evidently regards them as being of universal obligation, including mariners employed under every method of hiring. 1 Valin, 721. The decisions of the American courts rest upon and sanction the maritime codes of continental Europe upon this subject. Abb. Shipp. 260, notes; 3 Kent, Comm. (6th Ed.) 184–186, notes; Curt. Merch. Seam. 106–111. Seamen are entitled to be maintained and cured at the expense of the ship of sickness or injuries received while in her service. And courts would receive with great distrust any engagement upon the part of mariners to dispense with or qualify this privilege, alike important to them personally in point of humanity and in view of wise policy, in aid of the navigation and commerce of the country. The case of the libellant falls clearly within this rule, and nothing is shown in its character in any way detracting from his right to the full benefit of it. The pretended discharge at Lahaina was of no effect upon the rights of libellant, for the reasons already stated; and his assent to be put on shore, if such assent is to be implied, was only in accordance with the direction of the master and the convenience of the ship. He still continued entitled to support from the vessel, and to all the advantages he would have possessed if put on shore without being consulted or against his consent, or if he had continued on board during the residue of the cruise. In my judgment, therefore, there is no ground to question his right to be treated and cured at the expense of the ship.

The essential question is, what is the extent and duration of that charge, and how is its value to be measured in money? The vessel must cover every necessary and appropriate expenditure made and responsibility incurred by the libellant during the period, for board, nursing, or medical treatment. The authorities above referred to fully support his right of recovery to that extent; and whether such disbursements have been made by him, or there is an outstanding liability on his behalf for them, may be a fit subject of reference and adjustment before a commissioner. The main difficulty is, whether the libellant's disabilities still continue a charge upon the vessel after the voyage is fully completed, and if so, what is to be the legal termination of the charge. The expression often employed in the various ordinances and in the decisions is, that mariners are entitled to be

cured of sickness and wounds received in service of the ship.[4] This statement is clearly not to be taken in an absolute sense. That would involve impossibilities. Diseases and injuries so incurred are frequently in their nature, and in their direct consequences, incurable. An exposure to unusual labor or privations on the voyage may induce maladies permanent or irremediable in their character; thus broken limbs, or bodily debility resulting from services in the ship, are very often the sailor's heritage for the residue of his life.

Judge Story was manifestly laboring under uncertainty of mind whether the liability of the ship or owner was of indeterminate duration, and might be enforced so long as the necessity should continue. In Harden v. Gordon, [Case No. 6,047,] the rule was laid down with great amplitude, that the expenses of sick seamen were to be borne by the ship, including medicines, medical advice, nursing, and lodging. In The George, 1 Sumn. 59, [1 Sumn. 151, Case No. 5,329,] this rule was restated, and applied to the case of a mate substituted as master by the consul abroad, and who was lodged and treated on shore. In Reed v. Canfield, [Id. 11,641,] the point was presented with more distinctness, as that was a case of disability continuing after the termination of the voyage, and which might probably last for the life of the sailor. Judge Story puts the inquiries:—"What are the limits of the allowance?" "May they be extended over years or for life?" "Are they to be like the pensions allowed by some of the marine ordinances in cases of wounds and other injuries received by seamen in defending the ship from the attack of pirates?" These are interrogatories of great significance and weight, and it is to be regretted that the learned judge has not relieved the subject of its pressing difficulties by a more full solution of the questions. He says,—"The answer to suggestions of this sort is, that the law embodies in its formulary the limits of the liability. The seaman is to be cured at the expense of the ship of the sickness or injuries sustained in the ship's service. It must be sustained by the party while in the ship's service; and he is not to receive any compensation or allowance for effects of the injury which are merely consequential. The owners are liable only for expenses necessarily incurred for the cure, and when the cure is completed, at least so far as the ordinary medical means extend, the owners are free from all further liability." This is sufficiently distinct as to the period within which the injury must have been received, or the sickness incurred. The ship can only be held liable for those events occurring whilst the mariner is attached to her. 1 Pardessus, Droit Comm. § 688. Still, the

inquiry whether the cure required during the voyage is to be continued after its termination, is not met in terms by this decision, and seems to be left open for solution upon general principles. Reed v. Canfield, [supra.]

The British act of 7 & 8 Vict. (chapter 192, § 18) lays down a clear and practical rule upon this subject. It enacts that, in case the master or any seaman shall receive any hurt in the services of the ship, the expense of medical advice, attendance, medicine, and subsistence for him "until cured, or brought to this country," together with the costs of his conveyance thither, be defrayed by the owners without any deduction whatever from his wages. This is but a re-enactment, in substance, of the provisions of the act of 5 & 6 Wm. IV. c. 19. Abb. Shipp. 170; Id. 616. It is probable that the ancient ordinances referred to by Judge Story, were those cited by Cleirac, (Cont. de la Mer, 25, 26,) which provided that seamen wounded in fighting for their vessel, should, besides their cure, be supported for the rest of their lives at the expense of the ship and cargo; but I do not find this rule extended to ordinary cases of sickness or injuries in the merchant service. Ord. de Oleron, art. 7; Cleirac, 27. This was regarded as a general average charge. 9 Code de Commerce, art. 400. The French marine law, according to the commentary of Pardessus, limits the obligation of the master, in case of a seaman left sick abroad, to the providing for the charge of his sickness, and for the expense necessary to place him in a condition to return home. 1 Pardessus, § 688; 1 Boulay-Paty, 202; The Littlejohn, [Case No. 6,153.] The Code of Commerce leaves the subject without special legislation, (Code Comm. art. 262,) further than the general principle that the mariner shall be cured by the ship, and receive his wages without abatement. The term cure, was probably employed originally in the sense of taken charge or care of the disabled seaman, and not in that of positive healing. The obligation of the ship to the mariner would then be coextensive in duration to that of the mariner to the ship. Natural reason would seem to point to that limitation, it being the one consonant to the relation in which the law places the parties to each other, and by which it measures their privileges and liabilities under a shipping contract. This rule may undoubtedly be subject to variations. When a course of medical treatment, necessary and appropriate to the cure of the seaman, has been commenced and is in a course of favorable termination, there would be an impressive propriety in holding the ship chargeable with its completion, at least for a reasonable time after the voyage is ended or the mariner is at home. So, also, in case due attention to his necessities has been unjustly omitted by the ship abroad, or his case has been improperly treated, the courts

---

[4] Compare Ringold v. Crocker, [Case No. 11,843.]

may properly enforce against the ship this great duty towards disabled mariners, even after her contracts are terminated, upon the ground of a failure to perform towards them the obligation in the shipping contract. These particulars, however, are not stated as ingredients in the present case, but are referred to in illustration of the doctrine involved in some of the authorities, and to show they are not inconsistent with the general principle, that a seaman has no claim upon the ship or her owner for the cure of his sickness or disabilities after his contract has terminated, and he is returned to his port of shipment or discharge, or has been furnished with means to do so. A reference must be ordered to have an account stated upon the principles of this decree, stating the expenses incurred by the libellant, and the amount of wages due him, the credits to which the claimants are entitled, and the balance, if any, due the libellant. Decree accordingly.

NOTE, [from original report.] The report of the commissioner, filed pursuant to this decree, found that no balance was due to the libellant. On the confirmation of this report, the claimants moved, that the libel be dismissed with costs. The libellant objected to the allowance of costs, upon the ground that the main point in controversy was novel, and that the decision against his claim turned upon a point of law and not on the merits. The court concurred in this view, and denied costs against the libellant.